LUCERNE. The (CHAPMAN v.). See Case No. 2,605.

---

## Case No. 8,590.

### The LUCIA B. IVES.

[10 Ben. 660.][1]

District Court, S. D. New York. Dec., 1879.

LIEN—DOMESTIC VESSEL—ADVANCES—NECESSARIES—CHARTER—COSTS.

1. F. filed a libel against a vessel owned in the state of New York, to enforce a lien claimed to exist under the law of the state of New York, passed April 24, 1862. It appeared that F., as a broker, had negotiated a charter of the vessel for her owners, who resided at Sag Harbor, for a term of six months; that the charterer, who acted as master of her, applied to F. to know where he should get stores for the vessel and F. obtained from C. an order on L. for the stores, which were furnished to the master on that order. It appeared further that F. also procured $215 of C. on a pledge of bills of lading and paid it to the master to disburse the vessel. The voyage was broken up so that the security failed and F. claimed that he owed C. the money. It appeared, also, that he advanced to the master $20 for labor in getting the vessel moved from Jersey Flats to Brooklyn, and $49 paid on request of the owners for wages of seamen on a

[1] [Reported by Robert D. Benedict, Esq., and Benj. Lincoln Benedict, Esq., and here reprinted by permission.]

previous voyage, and $25 for obtaining a bond for the vessel when under arrest, which bond was not accepted, and $25 for fees paid at the custom house. And he claimed $41 for commissions in negotiating the charter: Held, that it did not appear that the libellant furnished the stores or advanced the money necessary to procure them.

2. It was not sufficiently proved that the $215 was advanced for the purpose of "procuring necessaries" for the vessel, and, besides, it was advanced, not by the libellant, but by C.

3. There was no lien on the vessel under the statute for the amount advanced for custom house fees, or for the sum paid to procure a bond, or for the commissions, they not being included in the term "necessaries."

4. For the amount paid for moving the vessel the libellant had a lien, and also for the sum advanced to pay off the seamen, although by the terms of the charter, the charterer had agreed to pay all expenses of the vessel.

5. As the principal part of the claim was disallowed, the libellant should not have costs. The case of The John Farron [Case No. 7,341], distinguished.

In admiralty.

L. S. Gove, for libellant.

W. W. Goodrich, for claimants.

CHOATE, District Judge. This is a libel filed by A. G. Fisher to enforce an alleged lien for supplies furnished and money advanced in this port for procuring necessaries for the schooner Lucia B. Ives of Sag Harbor. The lien is claimed under the statute of New York, passed April 24, 1862. The claim consists of three parts: (1), for ship chandler's stores sent on board by one John H. Lewis, but in fact supplied, as is alleged, by the libellant; (2), for money advanced to the master to be expended by him in necessaries, $215; (3), for money at different times advanced by the libellant to the master for specific necessaries, about $150. The statute referred to provides that "whenever a debt amounting to $50 or upwards, as to a sea-going or ocean-bound vessel, or amounting to $15 or upwards as to any other vessel, shall be contracted by the master, owner, charterer, builder or consignee of any ship or vessel, or the agent of either of them within this state for either of the following purposes, * * * 2d, for such provisions and stores furnished within this state as may be fit and proper for the use of such vessel at the time when the same were furnished, * * * 4th, on account of loading or unloading, or for advances made for the purposes of procuring necessaries for such ship or vessel, or for the insurance thereof; * * * such debt shall be a lien upon such vessel, * * * and shall be preferred to all other liens thereon except mariners' wages."

1. As to the stores furnished by Lewis, the libellant's testimony is that he was the broker who negotiated a charter of the vessel for the owners, who reside at Sag Harbor to one John Burns for the term of six months; that after the charter was effected, and while the vessel was in the possession of the charterer, who also acted as master, the libellant acted as agent for him, and the master made up a list

of the stores needed for the vessel, and asked the libellant where he should get them; that the libellant procured from one Crowell, his father-in-law, an order for the master upon Lewis to furnish these stores; that they were furnished on this order. Thus it appears that Lewis furnished the stores to the master, either partly or solely on the personal credit of Crowell. Crowell, though in court upon the trial, was not called as a witness. I do not think it can be fairly claimed that the libellant either furnished the stores or advanced the money for the purpose of procuring them. Whether Lewis or Crowell may have a lien under the statute is not now in question, but either of them, it seems, would, upon the evidence, have a better claim to be the party within the benefit of the statute than this libellant. The libellant says, indeed, that he owes Crowell the amount. This may be and yet he may not be within the statute; moreover, it appears that the libellant made no charge to the vessel or any person for these goods.

2. The $215 was procured of Crowell by the libellant upon the pledge of the freight bills or bills of lading for cargo shipped on the vessel for New Orleans. The libellant testifies that he paid it to the master to disburse the ship. This is all the proof there is that it was advanced, if advanced by him at all, for the purpose of "procuring necessaries." I think this evidence is wholly insufficient to prove this fact. Many things might be included in "disbursing the ship" which could not be considered "the procuring of necessaries," upon the most liberal interpretation of those words. Aside from this difficulty, I think it is entirely clear from the testimony that it was Crowell and not the libellant who advanced the money. The security taken has failed by the breaking up of the voyage, and the libellant claims that he owes Cromwell the amount as money borrowed, but the evidence, especially considering the fact that Crowell is not called as a witness, shows a direct advance by Crowell to the master on the pledge of the freight.

3. The claim for $150 advanced consists of several parts, $20 for labor in getting the vessel moved from Jersey Flats to Brooklyn, $49 paid by order of the owners for wages upon a previous voyage, $25 for obtaining bondsmen to release the vessel when under arrest, the bond, however, not being accepted, $25 for fees paid at the custom house, but what these fees were was not shown, and the remainder, about $41 for the libellant's commission as broker and agent in negotiating the charter, procuring freight, etc. It is conceded that the first item of $20 is properly to be treated as necessaries within the statute. The amounts paid to a person for procuring bondsmen to release the vessel, which bond he did procure but which was not accepted, and also the amount paid for custom house fees, seem not to be within the meaning of the term "necessaries" as here used. The word, taken

in connection with the other parts of the statute, seems to refer to something supplied to the ship, as materials, labor, provisions, stores, use of a place to lie in, etc. These are the things for which those furnishing them have a lien, and I see no reason for believing that the legislature intended to give a larger lien to one advancing money than to one directly dealing with the vessel. That all possible expenses of the owners for and on account of the vessel were not intended to be included in this provision for a lien for advances, seems to follow from the circumstance that the statute adds "or for the insurance thereof." It is noticeable that the statute gives no lien for wages, probably upon the theory that they are already satisfactorily provided for by the maritime law. The circumstances under which the $49 was advanced were that the former crew of the vessel refused to leave her until they were paid, and they threatened to libel her, and thereupon the libellant, at the written request of the owners, paid the master this money and with it he paid off the crew. On the whole, it seems to me that money advanced for wages is to be considered advanced for "necessaries" within the meaning of this act. That labor furnished in various forms has the benefit of the lien, is evident. The reason for omitting this particular form of labor and in not giving a lien for wages to the seamen themselves, is also evident. The omission of such provision is therefore no strong argument against including wages in the word "necessaries" in the provision in favor of the party advancing money. The item for commissions clearly was not advanced at all. As to the two items of $20 and $49, which are to be regarded as necessaries, I think it appears that the libellant advanced them. It is admitted, indeed, that he procured the money from Crowell, but there is no sufficient evidence, as in case of the $215, that they were direct advances by Crowell to the master, although the libellant left the master's receipts with Crowell when he got the money.

It is objected, however, that the libellant had knowledge of the charter by the terms of which the charterer stipulated to pay all the expenses of the vessel during the period of the charter, and the case of The John Farron [Case No. 7,341], is relied on to support this objection. The point was not decided in that case, but the learned judge intimates his opinion that knowledge of the terms of the charter would have defeated that claim. The agreement in the charter in that case was that the repairs to be made should not be a lien on the boat. In the present case, the agreement was that the charterer would pay all the expenses in question except the $49 for wages above referred to, and required the charterer to give security for the fulfilment of this agreement; and such security was given. While the knowledge of this charter was a circumstance to be considered

on the question whether credit was given to the vessel or to the charterer, I think it did not preclude the libellant from acquiring a lien under the state statute. In the case of The John Farron [supra], it might have been a fraud upon the owner to aid the charterer to impose the lien at all, because he agreed not to do it; but it was not in itself a fraud in this case, because the creation of the lien is not inconsistent with an intention on the part of the charterer to clear off all such incumbrances, and this is all that ne agreed to do and for which he gave the security. He did not agree to pay everything in cash. In the case of The City of New York [Case No. 2,758], Mr. Justice Nelson expressed the opinion that upon a charter similar to this a person supplying the vessel in a foreign port would have a maritime lien, although he knew of the charter. And I think the libellant's right, under the statute, is at least as great.

The owners were not proved, as claimed by the libellant, to have agreed, upon taking back the vessel, to pay all these bills, but only to discharge all valid liens. It was therefore open to them to deny that these were valid liens. The defence of collusion between the libellant and the charterer to defraud the owners is not sustained. As the principal part of the claim is disallowed, I think the libellant should not have costs. Decree for libellant for $69.